UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS,

Plaintiff,

v.

UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF NAVY, DONALD RUMSFELD in his capacity as the SECRETARY OF DEFENSE, and DONALD WINTER,[1] in his capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE NAVY,

Defendants.

C.A. No. 03-599T

## JOINT MOTION TO ENTER CONSENT DECREE

NOW COMES Plaintiff, STATE OF RHODE ISLAND, and Defendants, UNITED STATES OF AMERICA, et al., and hereby jointly move this Court to enter the Consent Decree. The Consent Decree was lodged with this Court on January 11, 2006, and available for public comment from January 23, 2006 through February 21, 2006. The Court should enter the Consent Decree for the reasons set forth in the attached memorandum of law.

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Donald Winter is substituted for Gordon England.

Respectfully submitted,

For the State of Rhode Island
PATRICK C. LYNCH
ATTORNEY GENERAL

By his attorney,

TRICIA K. JEDELE
Spec. Asst. Atty. General
150 South Main Street
Providence, RI 02903
Tel: 401-274-4400
Fax: 401-222-3016

For the United States

LAUREL A. BEDIG
United States Department
Of Justice
Environmental & Natural
Resources Division
Environmental Defense
Section
P.O. Box 23986
Tel: 202-305-0331
Fax: 202-514-8865

ROBERT CLARK CORRENTE
United States Attorney
MICHAEL P. IANNOTTI
Asst. United States Atty
District of Rhode Island

Dated: June 22, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF NAVY, DONALD RUMSFELD in his capacity as the SECRETARY OF DEFENSE, and DONALD WINTER,[1] in his capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE NAVY,<br><br>Defendants. | C.A. No. 03-599T |

**MEMORANDUM IN SUPPORT OF JOINT MOTION TO ENTER CONSENT DECREE**

**INTRODUCTION**

Plaintiff State of Rhode Island and Providence Plantations ("State") and Defendants United States of America, United States Department of Navy, United States Department of Defense ("United States") (the "Parties") jointly move the Court to enter the proposed Consent Decree in this action, which was lodged with the Court on January 11, 2006. The proposed Consent Decree resolves all of the claims in this case. Notice of the proposed Consent

[1]Pursuant to Federal Rule of Civil Procedure 25(d)(1), Donald Winter is substituted for Gordon England.

Decree was published on January 23, 2006, and was available for public comment up through and including February 21, 2006. The proposed Consent Decree is fair and reasonable, and is in the public interest. Therefore, the Court should grant the joint motion and enter the proposed Consent Decree.

## BACKGROUND

### A. Nature of the Complaint

This is a civil action against the United States pursuant to Section 107 of Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607; the federal Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the federal and Rhode Island Clean Water Acts, respectively 33 U.S.C. § 1251 et seq. and R.I. Gen. Laws § 46-12-1 et seq.; and state common law. The complaint seeks reimbursement of any future response costs incurred by the State in connection with Allen Harbor Landfill (the "Site") and recovery of damages to natural resources allegedly caused by the release of hazardous substances at, on or from the Site, which is a part of the former-Davisville Naval Construction Battalion Center ("NCBC Davisville") located in North Kingston, RI.

### B. Description of Facility and History of Operations

In 1939, Quonset Point was acquired by the Navy to establish a Naval Air Station and in 1942 the operations at Quonset Point expanded into what is now called NCBC Davisville. NCBC

Davisville provided mobilization support to the active Naval Construction Force; was a mobilization base for the rapid assembly outfitting and readying of Reserve Construction Battalions; stored, preserved and shipped advanced base and mobilization stocks; and procured, received, packed and shipped collateral equipment for military construction projects. NCBC Davisville was decommissioned and closed on April 1, 1994.

NCBC Davisville is located approximately 18 miles south of Providence, RI, in North Kingstown, and is approximately 900 acres. Allen Harbor Landfill is designated as Site 09 in the Federal Facility Agreement entered into by the Navy, the State and EPA. The Site consists of approximately fifteen acres of grassy wooded area bounded to the east by Allen Harbor, to the west by Sanford Road and to the north and south by vegetated wetlands. From approximately 1946 to 1972, the Site was operated by the Navy for the disposal of waste material generated by the NCBC Davisville facility and NAS Quonset Point.

In 1984, the State closed Allen Harbor to shellfishing. Subsequently, Site 09 was the subject of a remedial investigation performed by the Navy pursuant to CERCLA.

**C. Closure of NCBC Davisville and Transfer of the Allen Harbor Landfill Site to Town of North Kingstown**

In 1991, the Defense Base Closure and Realignment Commission recommended closure of NCBC Davisville. Pursuant to authority contained in the Federal Property and Administrative Service Act

of 1949 ("Federal Property Act"), as amended, and applicable rules, regulations and orders promulgated thereunder, the NCBC Davisville property was determined to be surplus to the needs of the United States. Under the Federal Property Act, property determined to be surplus can be disposed through a public benefit conveyance for designated uses.

Subsequently, on December 13, 2000, the Navy assigned the Site to the Department of the Interior for conveyance to the Town of North Kingstown via a public benefit conveyance for park and recreational purposes. On June 8, 2004, a Quitclaim Deed was executed between the United States (through the National Park Service), as Grantor, and the Town of North Kingstown, as Grantee, and the Site was transferred to the Town. Activities and uses for the Site are limited by both the terms of the public benefit conveyance and the Environmental Land Use Restrictions placed on the Site as part of the remedy.

**D. Remedy Selection**

NCBC Davisville was placed on the CERCLA list of national priority sites on November 21, 1989. In March 1992, EPA, the State and the Navy entered into a Federal Facility Agreement under CERCLA Section 120 ("FFA"). 42 U.S.C. § 9620. The purpose of the FFA is to ensure investigation and remediation of NCBC Davisville, and to establish a framework and time table for the development, implementation and monitoring of response actions at

the site. Specifically, and among other reservations, the FFA reserved claims for natural resource damage assessments, or for natural resource damages.

The FFA states that the Navy will take response actions at NCBC Davisville. Specifically, the Navy agreed to undertake, seek adequate funding for, and fully implement removal actions; study area screening evaluations; perform Remedial Investigations and Feasibility Studies; design proposed plans and Records of Decisions ("RODs"); undertake remedial actions, remedial designs, and "Operation and Maintenance." A separate agreement governs the Navy's responsibilities to pay the State's response costs. The Navy's ongoing cleanup responsibilities are not changed by the terms of the proposed Consent Decree.

Site 09 is that portion of NCBC Davisville that was designated as Site 09 in the FFA. The September 11, 1997, Final CERCLA Record of Decision ("ROD") for Site 09, which set forth the final chosen remedy for Site 09, included, among other things, the construction of a multimedia cap, creation of wetlands, establishment of appropriate land use restrictions, including the authority to establish deed restrictions regarding site and groundwater use, and long-term monitoring of landfill gas, groundwater, sediment, and shellfish quality. On September 25, 1997, the Rhode Island Department of Environmental Management sent a letter of concurrence to EPA stating that it concurred

with the final CERCLA ROD for Site 09.

**E. Nature of Alleged Federal Liability/Nature of NRD Claim**

The United States owned and operated NCBC Davisville during its entire operation and owned Site 09 until it was transferred to the Town of North Kingston on June 8, 2004.

The complaint alleges that Site 09 was the location of a landfill that received waste materials from 1946 to 1972 as summarized in the Navy's 1984 Initial Assessment Study, Remedial Investigations, and the 1997 Record of Decision. The complaint requests judgment against the Navy as strictly liable for any and all: (1) natural resource damages; (2) future costs incurred by Rhode Island concerning the inspection, monitoring, evaluation, assessment, sampling, analysis, and other removal or remedial response actions conducted at Site 09; and (3) interest, costs, attorneys' fees, damages, disbursements and other recoverable expenses. No dollar figure for damages was specified in the complaint.

The natural resources allegedly damaged by the disposal of hazardous substances at Site 09 include groundwater, wetlands, soil, marine sediments and shellfish resources. The complaint identifies the primary contaminants of concern at Site 09 as VOCs, heavy metals, and PCBs. The complaint also alleged that polycyclic aromatic hydrocarbons ("PAHs") and pesticides were detected in soil samples of the landfill cover, and that PAHs

were detected in ground water samples and shoreline sediments.

**THE PROPOSED CONSENT DECREE**

The proposed Consent Decree for Site 09 includes the following terms, generally stated below:

(A) The United States will pay the State the sum of $1,200,000.

(B) In exchange for the payment, the State covenants not to sue or take administrative action or further sue or prosecute the United States for Past Response Costs that may have been incurred by the State and/or for Natural Resource Damages resulting from releases at, on or from the Site under: (a) CERCLA Sections 107(a) or 113(f), 42 U.S.C.§ 9607(a), § 9613(f); (b) the Clean Water Act, 33 U.S.C. § 1251 et seq.; (c) the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; (d) Rhode Island Gen. Laws § 46-12-1, et seq.; (e) Rhode Island common law; and (f) any other provision of statutory or common law.

(C) The United States will have protection from contribution claims with respect to natural resource damages and the State's past response costs at the Site.

(D) The State will use at least $990,000 of the settlement amount solely to restore, replace or protect natural resources equivalent to the natural resources that have allegedly been injured at the Site. The remaining $210,000 of the settlement amount may be used to reimburse the State for its

Assessment Costs incurred at the Site.

(E) The State reserves its right with respect to any future response costs at the Site.

**STANDARD OF REVIEW**

The well-settled standard of review applied to a proposed settlement under CERCLA is whether the settlement is fair (from both procedural and substantive standpoints), reasonable, and consistent with the statute's purposes. United States v. Davis, 11 F. Supp.2d 183, 189 (D.R.I. 1998), aff'd, 261 F.3d 1, 23-28 (1st Cir. 2001). See also United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990).

"[I]t is the policy of [CERCLA] to encourage settlements," Cannons Eng'g at 84, and there is "a presumption in favor of voluntary settlement." United States v. Akzo Coatings of Amer., Inc., 949 F.2d 1409, 1424, 1436 (6th Cir. 1991). In reviewing a CERCLA consent decree, a court must determine that the decree is fair, reasonable and "'consistent with the purposes that CERCLA is intended to serve.'" Cannons Eng'g, 899 F.2d at 85 (quoting H.R. Rep. No. 99-253, Pt. 3, at 19 (1985) reprinted in 1986 U.S.C.C.A.W. 3038,3042). Review of such settlements is committed to the "trial court's informed discretion." Id. at 84 (citations omitted).

The Court's review of the proposed Consent Decree does not consist of a *de novo* review of the evidence, see id., however,

"the Court must make an independent judgment as to whether the proposed settlement is fair and reasonable." United States v. Davis, 11 F. Supp.2d at 189 (citation omitted). A court may not substitute its own judgment for that of the parties to the decree. United States v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir. 1986) (a reviewing court may not modify but only approve or reject a consent decree).

Protection of the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate. In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1028 (D. Mass. 1989).

**DISCUSSION**

The Court should enter the proposed Consent Decree because, as a number of factors demonstrate, the proposed Consent Decree is fair, reasonable and in the public interest. First, the Parties were well aware of the facts of the case and each other's theories as substantial discovery in the case had taken place before settlement was reached. Second, the settlement resulted from the Parties' participation in the Court's mediation program thereby involving a neutral party in the negotiations. Finally, the State published a notice of the proposed Consent Decree and afforded the public the opportunity to review and comment on the proposed Consent Decree for a thirty-day period. Two comments were received and responded to by the State.

**A. The Proposed Settlement is Fair, Reasonable and Adequate.**

The substance of the proposed Consent Decree was the product of a two-day mediation presided over by the Court's mediator, Mr. Berry B. Mitchell, on October 27-28, 2005. Thus, a neutral party listened to both sides and actively assisted the settlement process to ensure that a fair, reasonable and adequate settlement was achieved. The negotiations were conducted by legal and technical representatives from both Parties. During the mediation, both Parties presented their legal arguments and views of their respective experts. Thereafter, Mr. Mitchell held private conferences with the legal representatives of each Party and also spoke privately to several of each Party's experts. He candidly discussed the strengths and weaknesses of each Party's position.

Additionally, prior to the mediation, substantial discovery had been completed, including interrogatories, requests to admit, document production and depositions. In addition, both Parties retained experts in hydrology, shellfish resources, fate and transport of chemicals, groundwater economics, natural resource damage economics and toxicology. Each of those experts prepared expert reports and participated extensively in both case development and in mediation. Thus, the Parties had ample information at hand to consider the strengths and weaknesses of their respective arguments.

Alleged injury to shellfish resources comprised a large portion of the State's claim. Each Party had developed very different models to measure those damages, thus, each Party was forced to weigh the risk that its model would not be accepted by the Court. Different approaches to valuing groundwater were also employed by each Party. These litigation risks were taken into consideration in reaching settlement.

The fact that the settlement was "negotiated at arm's length among experienced counsel" supports the request that it be approved. Cannons Eng'g, 899 F.2d at 87. Moreover, the assistance of the Court's mediator in the settlement negotiations was instrumental in guiding the Parties to a settlement. Mr. Berry's presence insured that the mediation was conducted in an equitable manner and his unbiased views helped the Parties reach a fair settlement. See Davis, 261 F.3d at 23 (assistance of neutral noted in assessing fairness of settlement).

### B. The Proposed Settlement is in the Public Interest.

The settlement provides money to be paid by the United States to the State for the purpose of restoring, replacing or protecting natural resources equivalent to the resources that have allegedly been injured at the Site. Therefore, the settlement is in the public interest in that it will provide money to the State to use in a specific manner for the benefit of the public.

Moreover, the settlement avoids potentially lengthy and costly litigation, including a long trial and possible appeal. The settlement promotes CERCLA's goals by "reduc[ing] the time and expense of . . . litigation that necessarily diverts money from cleanup and restoration." In re Acushnet River & New Bedford Harbor, 712 F. Supp. at 1027.

Consequently, the proposed Consent Decree is in the public interest and consistent with CERCLA.

**C. The Public was Afforded the Opportunity to Review and Comment Upon the Settlement.**

On January 23, 2006, the State published notice of the proposed Consent Decree and made copies of the proposed Consent Decree available to the public for review and comment. The State received two comments on the proposed Consent Decree. One comment was from Mr. Jack F. King, a neighboring landowner to the Site. Mr. King requested that the settlement amount be designated to be spent exclusively on the Allen Harbor area. He also requested that the Navy be required to investigate or test the four privately owned lots adjacent to the Site. A copy of Mr. King's comments and the State's response are attached hereto as Exhibit A and Exhibit B.

A second comment was received from the Town of North Kingstown, attached hereto as Exhibit C. Those comments were supportive of the proposed Consent Decree and set forth a proposed plan for use of some of the settlement monies for

groundwater restoration. The State responded to the Town's comments on May 31, 2006, a copy of which is attached hereto as Exhibit D.

The comments received were not materially adverse to the proposed Consent Decree and the State considered and adequately addressed the comments. The State and the United States agree to the provisions of the proposed Consent Decree. Thus, the proposed Consent Decree should be entered by this Court without change to its terms.

**CONCLUSION**

For the foregoing reasons, the Court should grant this motion and enter the proposed Consent Decree as an order of this Court.

Respectfully submitted,

**For the State of Rhode Island:**

TRICIA K. JEDELE
Special Assistant
Attorney General
Rhode Island
Department of
Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
Fax: (401)222-3016

**For the United States:**

LAUREL A. BEDIG
United States Department of
Justice
Environment & Natural
Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
Tel: (202) 305-0331
Fax: (202) 514-8865

ROBERT CLARK CORRENTE
United States Attorney
District of Rhode Island

MICHAEL P. IANNOTTI
Assistant United States
Attorney
District of Rhode Island

Dated: June 22, 2006

Jack F. King, Jr.
220 Forge Road, North Kingstown, Rhode Island 02852

Mr. Gerald McAvoy
Executive Counsel
Office of Legal Services
Rhode Island DEM
235 Promenade Street
Providence RI 02908

February 21, 2006

RE: State of RI vs. USA et al 03-599T
Allen's Harbor Consent Decree
Public comment request

Dear Mr. McAvoy,

I have read the consent decree and have some concerns. I am an abutting landowner with approximately 800' of frontage to the Allen's Harbor landfill site. As your drawings show there is a wetland adjacent to the site on its North Westerly side. I share that wetland with my neighbor who also has a considerable amount of frontage. To my knowledge my property has never been tested for any damage nor has any remediation taken place. The settlement makes reference to using the funding for equivalent projects or protections which I disagree with as the Allen's Harbor area certainly could use the funding for improvements for the enjoyment of all.

I applaud the State for pursuing the Federal Government with the same zeal they would a private individual or business however I fail to see the financial harm the Sate suffered being alleviated without specifically earmarking the settlement for that location. I also question where my State Government was looking out for my interests as a citizen given my close proximity to the affected area. Especially in light of the "First of its kind" precedent that was set.

Jack F. King, Jr.
220 Forge Road, North Kingstown, Rhode Island 02852

I would compare the situation to the Fire Department putting out a fire at City Hall but ignoring 4 adjacent private properties as smoke was swirling. By allowing that settlement to go anywhere the whole process seems mercenary.

In closing I would ask that before the State accepts the settlement they ask the Navy to investigate or test the 4 privately owned adjacent lots which encompass approximately 80 acres total of which I estimate 10 acres are within 200' of the site. I would also ask the State to change the wording to ensure the settlement funds are used to improve the Allen's Harbor area exclusively.

I can be reached at 737 2000 if you would like to discuss this with me.

Sincerely,

Jack F. King Jr.

CC: Ms. Tricia K. Jedele RIAG

RHODE ISLAND
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
235 Promenade Street, Providence, RI 02908-5767 TDD 401-222-4462

OFFICE OF LEGAL SERVICES
*Brian A. Wagner, Deputy Chief Legal Counsel*
**Tel.** (401) 222-6607
**Fax** (401) 222-3378
*brian.wagner@dem.ri.gov*

RECEIVED
APR 26 2006
Dept. of Attorney General
Civil Division

April 19, 2006

Mr. Jack F. King, Jr.
220 Forge Road
North Kingstown, RI 02852

RE: *Response to February 21, 2006, Comment Letter concerning proposed settlement in* *State of Rhode Island vs. United States of America*, *C.A. No. 03-599T*

Dear Mr. King;

The Rhode Island Department of Environmental Management, Office of Waste Management (RIDEM) would like to thank you for submitting the above-referenced comments regarding the proposed Natural Resource Damages settlement at the Allen Harbor Landfill (Site 09).

As to your request that the lots adjacent to Site 09 be investigated, please be assured that the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") requires that the remedy selected for Site 09 both clean and control further releases of contamination from Site 09 in a manner that assures the protection of human health and the environment. In accordance with its obligations under CERCLA and the Federal Facilities Agreement that governs all remedial investigations at the Naval Construction Battalion Center, the Navy has conducted numerous investigations on and around Site 09 to evaluate the severity and extent of contamination. Several of the Navy's investigations were in the vicinity of your property. Specifically, as part of the early investigations for Site 09, a groundwater monitoring well was placed (MW09-13) on the lot just to the north of your property (Plat 165, Lot 2). This well was sampled twice, once in 1993 and again in 1995, and was found to meet all applicable Groundwater Objectives.

As part of the remedy for the Site 09, the Navy is obligated to conduct long term monitoring to insure the remedy continues to protect of human health and the environment into the future. The details of these obligations are explained in a number of documents contained in the Administrative Record for Site 09, including the document referred to as the "Record of Decision" for Site 09. The types of investigations, the length of long-term monitoring, and the remedies selected for Site 09 were reviewed and agreed to by both the United States Environmental Protection Agency ("EPA"), the Rhode Island Department of Environmental

Management and were previously subject to public review and comment. If the long-term monitoring indicates that additional measures are needed to protect human health and the environment, then the Navy will be responsible for conducting any additional remedial actions or investigations that may be deemed necessary or appropriate.

As for your concern that all of the settlement monies be earmarked exclusively to the Allen Harbor area, please be advised that the use of the proceeds generated by this settlement are outlined by CERCLA, *see 42 U.S.C. § 9607(f)(1)*, which requires that natural resource damages be used to restore, replace or acquire equivalent natural resources at the discretion of the natural resource Trustees. In considering how to use the settlement proceeds we have evaluated the recommendations of experts and staff as well as considering comments submitted by you and others. The State shares your desire to see these proceeds directly benefit the injured area as much as possible. Accordingly the State has determined that a portion of the funds will be allocated to the Town of North Kingstown for the purpose of protecting and restoring groundwater resources via a project referred to as the Saw Mill Pond Project and that the remaining monies will be allocated for projects that benefit the State's shellfishery both near-term and long-term. By their very nature, the proposed shellfish restoration projects will involve areas both within and outside of the Town of North Kingstown.

Again we would like to thank you for your interest and comments. If you have any questions regarding the investigation or remediation of the Allen Harbor Landfill Site, please contact Richard Gottlieb of RIDEM, at 401-222-2797, ext. 7138. If you have any other questions or require additional information regarding the Natural Resources Damages settlement please feel free to contact Tricia K. Jedele, Special Assistant Attorney General at 401-274-4400. ext. 2400.

Very truly yours,

Brian A. Wagner, Esq.
Acting Executive Counsel

Cc: Laurel Bedig, Trial Attorney, US Dept. of Justice
Tricia K. Jedele, Special Assistant Attorney General, RIAG
Richard Gottlieb, Office of Waste Management, RIDEM

TOWN OF
# NORTH KINGSTOWN, RHODE ISLAND

NORTH KINGSTOWN
INCORPORATED 1674

80 BOSTON NECK ROAD
NORTH KINGSTOWN, R.I. 02852-5762
PHONE: (401) 294-3331
www.northkingstown.org

February 21, 2006

RECEIVED
FEB 22 2006
Dept. of Attorney General
Civil Division

Mr. Gerald F. McAvoy
Executive Council
Office of Legal Services
Rhode Island Department of Environmental Management
235 Promenade Street
Providence, RI 02908

RE: State of Rhode Island v United States of America, et al., 03-599T (DRI)
Allen Harbor, North Kingstown, RI

Dear Mr. McAvoy:

This letter is in response to the Rhode Island Department of Environmental Management's (DEM) 30-day public comment period on a proposed Consent Decree that was reached between the State and the US Navy for irreversible natural resource damages in North Kingstown.

On behalf of the Town of North Kingstown, I would like to congratulate the DEM and the Attorney Generals office on the settlement of this case. At this time, the Town of North Kingstown wishes to formally comment on the use of the settlement funds. It has been indicated that the majority of the settlement money will contribute towards the restoration of shellfish habitat in Narragansett Bay. The Town recognizes the importance of shellfish habitat restoration and enthusiastically supports this endeavor. However, DEM should also allocate a portion of the settlement funds to improving groundwater resources in North Kingstown that were damaged by pollutants from the Allen Harbor Landfill.. Directing a portion of the settlement funds towards the Town's groundwater restoration project at Saw Mill Pond would greatly benefit North Kingstown's groundwater resource. In the past, the Town has submitted preliminary cost estimates to the Attorney General's office regarding this project in relation to the Calf Pasture settlement and this settlement. Enclosed you will find my July 15, 2005 letter to Trish Jedele, Special Assistant Attorney General, discussing the Saw Mill Pond project.

The total cost for the first phase of the Saw Mill Pond water quality improvements is estimated to be $410,000. The Town of North Kingstown wishes to see this project

proposal, detailed in the July 15, 2005 letter, completed with the use of the funds from both the Calf Pasture settlement and the Allen Harbor settlement.

The project consists of various stormwater management improvements in conjunction with a larger vision for the restoration of the stream and habitat at Saw Mill Pond.

These improvements would have the following two major interrelated benefits:

1. Reduce the amount of stormwater coming off of the developed upland area into the stream and pond so that there are no highly erosive velocities and volumes carrying pollutants into the system.

2. Create opportunities for stormwater to soak into and filter through the soil so that it can either be taken up by the roots of trees or other plants and transpired back into the air or recharged into groundwater resources; then groundwater flows can contribute to the pond and stream more appropriately, at slower velocities and smaller volumes.

We are anticipating that several locations will be chosen for infiltration improvements around the pond. According to soil survey maps for Rhode Island, these locations appear to be suitable for utilizing stormwater infiltration for groundwater recharge. It may also be useful to utilize groundwater infiltrators or other infrastructure below the soil surface to help facilitate this infiltration in some areas.

These implementation measures will require further study but from the information available the following additional groundwater recharge measures would be typical of measures recommended for installation in the Sawmill Pond/Sandhill Brook area to improve groundwater quality:

1. The traffic circle at Lake Drive presents a key opportunity for groundwater infiltration. Currently the site is a grass mound, but if dug out with breaks in the curb and plantings it could effectively capture and soak in rainwater as a bioretention area or rain garden.

   The anticipated cost estimate for the 7,800 square foot area is $40,000.

2. Along Lake Drive, Sachem Road, and Brookside Drive, there appear to be opportunities where roadside rain gardens would be appropriate. This would involve a swale in the town right-of-way that could be planted all along the length of the roads. These have been used effectively in other areas to decrease pollutants in runoff and improve groundwater quality.

   The estimated cost for 150 square foot rain gardens at 200 house lots, at a cost of $10 per square foot, is $300,000

3. At the Elementary School adjacent to the pond, it appears there is sufficient space to capture some stormwater runoff from Lake Drive and from the school's parking lot, a large part of which delivers sheet flow stormwater to Lake Drive. Stormwater could be directed to a below-ground infiltration device.

   The estimated cost for design and construction of an infiltrator structure is $55,000.

4. Prior to moving forward with any of the above measures that are recommended in the SRICD study the Town would contract with an engineering firm for a feasibility study.

   The estimated cost of the feasibility study is $15,000.

These estimated costs come to a total of $410,000 to implement water quality improvements through groundwater recharge measures at Saw Mill Pond.

In addition to the anticipated stormwater/groundwater water quality improvements listed above, the study that was completed by the Southern Rhode Island Conservation District recommended exploration of additional water quality, habitat restoration and recreational improvements that are outside the scope of what could be accomplished with the use of CERCLA Natural Resources Damages funds. These anticipated improvements include the following:

- Installation of a forebay to limit sediment entering the pond; as noted above, the stormwater pipes in the neighborhood discharge directly into the pond. This includes stormwater flow from the nearby school parking lot.

- Installation of a fishway to allow fish to pass over the dam; information gathered by SRICD shows the pond to have very limited fish population of macrohabitat generalists, which can tolerate warm waters, sluggish streams, and ponds. It has not been determined whether the fish community is due to flow or temperature or possibly chemical contamination.

- Development of a perimeter trail system around the pond and possibly non-motorized boat access to the pond. Over the last five years, the Town has been working with the Davisville neighborhood residents, University of Rhode Island Landscape Architecture students and neighborhood groups to establish the pond area as a focus for the neighborhood. These efforts have resulted in the residents establishing annual earth day clean-ups around the pond area, town public works cooperation regarding removal of grass clippings and brush from the pond area and community efforts to bring private contributions to improvement around the pond area.

- Replacement of the causeway. There is a causeway that crosses the pond connecting two high-density residential neighbors and an elementary school. Inspection of the causeway indicates that there may be siltation on the sides and that the culvert may be failing and/or undersized. Subsequent to the determination regarding the restoration or removal of the dam the causeway will be evaluated regarding its contribution to the degradation of the pond and groundwater. Should the pond be dredged to allow a smaller pond and possible sediment management at the pond, a bridge replacing the causeway may be more appropriate and less constricting to the free flow of the water.

Restoration of the dam, dredging of the pond, and long-term sediment management with a forebay is a costly endeavor. Estimated costs cannot be determined until engineering studies are completed. It is the town's intent to work simultaneously toward all of the needed water quality and habitat restoration projects to promote the most cost effective and beneficial restoration of groundwater quality and habitat of the Saw Mill Pond and the Sandhill Brook. It should be noted that the proposed scope of work for these improvements may change as an engineering feasibility report is completed. The major focus of the Town for this area is the improvement of water quality.

Thank you for the opportunity to comment on the use of the settlement funds for the Allen Harbor Landfill settlement and to identify and describe a project that would benefit the environment and balance the natural resource damage that has occurred at Allen Harbor. If you have any questions about the above or need additional information, please feel free to contact me or the Planning Director Jonathan Reiner at (401) 294-3331, Ext 200 or 310 respectively.

Sincerely,

Richard Kerbel
Town Manager

Enclosure

Cc: North Kingstown Town Council
A. Lauriston Parks, Town Solicitor
Jonathan Reiner, Director of Planning
Phil Bergeron, Director of Public Works
Cynthia Olobri, Finance Director
Daniel O'Connor, Leisure Activities Director
Sue Licardi, Director of Water Supply
Trish Jelede, Special Assistant Attorney General
W. Michael Sullivan, Director of Department of Environmental Management
Richard Gottlieb, RI Department of Environmental Management

JR
Part
Return to File

NORTH KINGSTOWN
INCORPORATED 1674

TOWN OF
NORTH KINGSTOWN, RHODE ISLAND

80 BOSTON NECK ROAD
NORTH KINGSTOWN, R.I. 02852-5762
PHONE: (401) 294-3331
www.northkingstown.org

July 15, 2005

Ms. Trish Jedele
Office of the Attorney General
150 S. Main Street
Providence, RI 02903

RE: CERLA Natural Resources Damages
Calf Pasture Point, North Kingstown, RI

Dear Ms. Jedele:

This letter is in response to your request for additional information regarding the Sawmill Pond/Sandhill Brook restoration of wetlands, water quality improvements, and associated studies and design programs proposed to be undertaken with CERLA Natural Resources Damages program funds. We trust that the following will assist you.

In December of 2004, the Town contracted with Southern Rhode Island Conservation District (SRICD) for their technical expertise and to have them prepare a report that identifies the major issues and strategies necessary to move forward with improvements to Sawmill Pond that when implemented would improve groundwater quality in the area.

Since the contract began SRICD has gathered all available existing information on Saw Mill Pond in relation to water quality, conducted research and developed three potential strategies. They are now in the process of identifying additional technical expertise and preparing the first draft of the written report. In addition they have conducted several small group meetings and two public presentation meetings to gather public input. The first public meeting was held on June 23, 2005 and the second follow-up meeting will be held on Thursday, July 14th, 2005. Press releases and meeting notices were sent to the local newspapers, public officials, neighborhood groups and persons owning property near or adjacent to the pond. (Please see attached press releases).

Much of the work to date has focused on Sandhill Brook, the stream that flows into and out of the pond, and the Saw Mill Pond dam (constructed in the 1700s and rebuilt at least once since then), which is now failing.

The July 14th meeting will include a presentation of three possible courses of action for Sawmill Pond and Sandhill Brook. The proposed options include:

1. A full pond with a completely restored dam,
2. The construction of smaller pond with a restored dam, possibly smaller in size, and
3. The removal of the dam and the complete restoration of the stream to its natural state.

Once it is determined which course of action would be most beneficial to the improvement of the groundwater, to the restoration of the habitat, and also be acceptable to the neighborhood, the Town will work toward the implementation of those improvements.

Improvements in upland stormwater management for the purpose of improving surface and groundwater quality is an element that is shared by all three of the proposed Sawmill Pond improvement scenarios. The existing stormwater infrastructure around the pond consists of two catch basins at the end of Lake Drive that deliver water from Lake Drive and the Elementary School parking lot to an outlet right next to the causeway; a Brookside Drive outfall where stormwater is directed off the road into two asphalt channels that dump directly into Sandhill Brook, just south of the pond; and two catch basins at the end of Sachem Road that deliver water from that area to an outlet at the pond.

There is approximately 1.7 square miles of developed watershed that drains to Sandhill Brook above Saw Mill Pond's dam, with many contributing outfalls, and the three mentioned above flowing directly into the pond. Studies have shown that the waters are impaired and summer water temperatures are too high. The TMDL study for the Hunt River System, which Sandhill Brook contributes to, shows a 79% load reduction needed in Sandhill Brook to meet fecal coliform water quality standards.

Upland stormwater improvements are a critical element for all three possible scenarios at Sawmill Pond. The idea is to capture rain close to where it falls and facilitate the movement of water into the soil wherever possible.

These improvements would have two major interrelated benefits. They would:

1. Reduce the amount of stormwater coming off of the developed upland area into the stream and pond so that there are no highly erosive velocities and volumes carrying pollutants into the system.

2. Create opportunities for stormwater to soak into and filter through the soil so that it can either be taken up by the roots of trees or other plants and transpired back into the air or recharged into groundwater resources; then groundwater flows can contribute to the pond and stream more appropriately, at slower velocities and smaller volumes. Many waterways rely on groundwater flows and it is clear from USGS flow studies that Sandhill Brook is no exception. The brook is increasing in volume along its journey to the Hunt River.

We are anticipating that several locations will be chosen for infiltration improvements around the pond. According to soil survey maps for Rhode Island, these locations appear to be suitable for utilizing stormwater infiltration for groundwater recharge. It may also be useful to utilize groundwater infiltrators or other infrastructure below the soil surface to help facilitate this infiltration in some areas.

These implementation measures will require further study but from the information available the following additional groundwater recharge measures would be typical of measures recommended for installation in the Sawmill Pond/Sandhill Brook area to improve groundwater quality:

1. The traffic circle at Lake Drive that presents a key opportunity for groundwater infiltration. Currently the site is a grass mound, but if dug out with breaks in the curb and plantings it could effectively capture and soak in rainwater as a bioretention area or rain garden.

   Anticipated cost estimate for 7,800 square foot area $40,000.

2. Along Lake Drive, Sachem Road, and Brookside Drive, there appear to be opportunities where roadside rain gardens would be appropriate. This would involve a swale in the town right-of-way that could be planted all along the length of the roads. These have been used effectively in other areas to decrease pollutants in runoff and improve groundwater quality.

   Estimated cost estimate for 150 square foot rain gardens at 200 house lots at a cost of $10 per square foot is $300,000

3. At the Elementary School adjacent to the pond, it appears there is sufficient space to capture some stormwater runoff from Lake Drive and from the school's parking lot, a large part of which delivers sheet flow stormwater to Lake Drive. Stormwater could be directed to a below-ground infiltration device.

   Estimated cost for design & construction of an infiltrator structure is $55,000.

4. Prior to moving forward with any of the above measures that are recommended in the SRICD study the Town would contract with an engineering firm for a feasibility study.

   The estimated cost of the feasibility study is $15,000.

These estimated costs come to a total of $410,000 to implement water quality improvements through groundwater recharge measures at Saw Mill Pond.

In addition to the anticipated stormwater/groundwater water quality improvements listed above, it is anticipated that the SRICD study will recommend exploration of additional water quality, habitat restoration and recreational improvements that are outside the scope of what could be accomplished with the use of CERLA Natural Resources Damages funds. These anticipated improvements include the following:

- Installation of a forebay to limit sediment entering the pond; as noted above, the stormwater pipes in the neighborhood discharge directly into the pond. This includes stormwater flow from the nearby school parking lot.

- Installation of a fishway to allow fish to pass over the dam; information gathered by SRICD shows the pond to have very limited fish population of macrohabitat generalists, which can tolerate warm waters, sluggish streams, and ponds. It has not been determined whether the fish community is due to flow or temperature or possibly chemical contamination.

- Independent Sewage Disposal Systems upgrades in homes around the pond; it is estimated that thirty to forty percent of the homes near or around the pond are on cesspool systems for sanitary waste handling. Watershed tests show elevated nitrogen and fecal coliform counts. TMDL attributes fecal coliform to stormwater, waterfowl, and wildlife.

- Development of a perimeter trail system around the pond and possibly non-motorized boat access to the pond. Over the last five years, the Town has been working with the Davisville neighborhood residents, University of Rhode Island Landscape Architecture students and neighborhood groups to establish the pond area as a focus for the neighborhood. These efforts have resulted in the residents establishing annual earth day clean-ups around the pond area, town public works cooperation regarding removal of grass clippings and brush from the pond area and community efforts to bring private contributions to improvement around the pond area.

- Replacement of the causeway. There is a causeway that crosses the pond connecting two high-density residential neighbors and an elementary school. Inspection of the causeway indicates that there may be siltation on the sides and that the culvert may be failing and/or undersized. Subsequent to the determination regarding the restoration or removal of the dam the causeway will be evaluated regarding its contribution to the degradation of the pond and groundwater. Should the pond be dredged to allow a smaller pond and possible sediment management at the pond, a bridge replacing the causeway may be more appropriate and less constricting to the free flow of the water.

Restoration of the dam, dredging of the pond, and long-term sediment management with a forebay is a costly endeavor. Estimated costs cannot be determined until engineering studies are completed. It is the town's intent to work simultaneously toward all of the needed water quality and habitat restoration projects to promote the most cost effective and beneficial restoration of ground water quality and habitat of the Saw Mill Pond and the Sandhill Brook. It should be noted that the proposed scope of work for these improvements may change as the Saw Mill Pond report is completed, and an engineering feasibility report is completed. The major focus of the Town for this area is the improvement of water quality.

Thank you for the opportunity to fully identify and describe a project that would benefit the environment and balance the natural resource damage that has occurred at Calf Pasture Point. If you have any questions about the above or need additional information, please feel free to contact me or the Planning Director Jonathan Reiner at (401) 294-3331, Ext 200 or 310 respectively.

Sincerely,

Richard Kerbel
Town Manager

Cc: North Kingstown Town Council
A. Lauriston Parks, Town Solicitor
Jonathan Reiner, Director of Planning
Phil Bergeron, Director of Public Works
Cynthia Olobri, Finance Director
Daniel O'Connor, Leisure Activities Director
Sue Licardi, Director of Water Supply
Richard Gottlieb, Department of Environmental Management
W. Michael Sullivan, Director of Department of Environmental Management



TOWN OF NORTH KINGSTOWN
PLATS: 147,148,149,
155,156,157, and 181
156
155
157
149
148
147
181
SAND HILL POND
SAW MILL POND
POST ROAD

# Town to Hold Sawmill Pond Meetings

FOR IMMEDIATE RELEASE

Contact: Patricia Nickels
Principal Planner
Town of North Kingstown
(401) 268-1571

To continue shaping a future for Davisville's Sawmill Pond, the Town of North Kingstown invites residents to a series of two public meetings, on June 23 and July 14. The meetings will be held at the Davisville Middle School Library, beginning at 7 p.m.

At the first meeting on June 23, consultants from the Southern Rhode Island Conservation District (SRICD) will present information on water quality and water quantity. They will also review several examples of how other communities have resolved issues at places similar to Sawmill Pond. SRICD will then facilitate a discussion, posing several questions about the pond to get a sense of how the community might like to proceed.

Based on the dialogue at the June 23 meeting, SRICD will develop conceptual graphics exploring some of the main ideas. The July 14 meeting will involve another dialogue where the Davisville community can respond to the graphics, further refining what they would most like to see at Sawmill Pond.

North Kingstown's Principal Planner Patricia Nickles observes, "These meetings build on the work the community has done with the landscape architecture students from the University of Rhode Island. The format will allow us to understand key information, not only about the pond, but Sandhill Brook which feeds into the pond, and then talk about how we want to proceed. The intent is to begin a more focused exploration of Sawmill Pond's future."

The Town of North Kingstown has hired the Southern Rhode Island Conservation District for the study of Sawmill Pond thanks to funding from the Rhode Island Community Development Block Grant Program. SRICD's work will result in a report that outlines a strategy, and identifies the necessary technical expertise and potential resources for moving forward at Sawmill Pond.

# Future of Sawmill Pond to be Discussed

FOR IMMEDIATE RELEASE

Contact: Patricia Nickels
Principal Planner
Town of North Kingstown
(401) 268-1571

As part of the continuing effort to define a future for Sawmill Pond, the Town of North Kingstown invites residents to share in the dialogue about possible options. A meeting will be held on Thursday, July 14, at 7 p.m. in the Davisville Middle School Library. At this meeting, the second in a two-part series, residents can review conceptual drawings that show what the pond and dam might look like if they are restored or if they are altered.

Some 16 residents who attended the first meeting on June 23 heard from the Town's consultant, the Southern Rhode Island Conservation District, about water quantity and water quality issues, and the stream system of which Sawmill Pond is a part. They also heard several stories about how other communities have resolved their problems with failing dams and mill ponds.

A discussion among meeting participants explored a range of scenarios, from, "...pull out the dam and causeway and see how it settles..." to "...rebuild the dam and dredge the pond...." Participants who supported the idea of rebuilding the dam and dredging the pond were asked whether they would be willing to contribute or pay for improvements. One resident remarked that without knowing a specific dollar amount, it is tough to respond. Another resident expressed concern for the likely high cost of that particular option.

Nearly all participants wished to see either the pond and dam restored or the pond and dam altered to improve water quality and fish passage. These two scenarios will be further explored at the upcoming July 14 meeting.

The Town of North Kingstown has hired the Southern Rhode Island Conservation District for the exploration of Sawmill Pond's future thanks to funding from the Rhode Island Community Development Block Grant Program. The District's work will result in a report that outlines a strategy, and identifies the necessary technical expertise and potential resources for moving forward at Sawmill Pond.


TOWN OF NORTH KINGSTOWN
PLATS: 147,148,149,
155,156,157, and 181
REVISIONS:
155
156
157
149
148
147
181
SAND HILL POND
SAW MILL POND
POST ROAD

RECEIVED

JUN 02 2006

Dept. of Attorney General
Civil Division

RHODE ISLAND
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
235 Promenade Street, Providence, RI 02908-5767 TDD 401-222-4462

OFFICE OF LEGAL SERVICES
*Brian A. Wagner, Deputy Chief Legal Counsel*
**Tel.** (401) 222-6607
**Fax** (401) 222-3378
*brian.wagner@dem.ri.gov*

May 31, 2006

Richard Kerbel
Town Manager
Town of North Kingstown
80 Boston Neck Road
North Kingstown, RI 02882

*Re: Saw Mill Pond*

Dear Mr. Kerbel:

This letter is to advise you that the Department has agreed to direct $195,000 from its settlement of the Allen Harbor litigation towards the Town of North Kingstown's Saw Mill Pond project for the protection, restoration and preservation of groundwater resources. This contribution, when combined with the Department's previous contribution of $215,000 from the Calf Pasture Point settlement will fully fund the $410,000 cost of the first phase of the Town's Saw Mill Pond project. This decision is subject to the Department's receipt, review and approval of a proposed scope of work for the project documenting the work to be performed using the settlement proceeds. All funds no used to support the Saw Mill Pond project shall be returned to the Department for use consistent with the approved Consent Decree. The Department reserves the right to seek recovery of any funds that are improperly used. Please contact me if you have any questions.

Very truly yours,

Brian A. Wagner
Acting Executive Counsel

Cc: W. Michael Sullivan, Director
Terrence Gray, Assistant Director
Trisha Jedele, Assistant Attorney General

30% post-consumer fiber